## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

### NO. 2017-CA-00847-COA

**CHRISTOPHER PAUL VANDENBROOK**                            **APPELLANT**

**v.**

**CHARLOTTE EMMA (MCKINNEY)**                         **APPELLEE**
**VANDENBROOK**

| | |
|---|---|
| DATE OF JUDGMENT: | 01/03/2017 |
| TRIAL JUDGE: | HON. VICKI B. DANIELS |
| COURT FROM WHICH APPEALED: | DESOTO COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANT: | D. PACE BRANAN |
| | T. SWAYZE ALFORD |
| | KAYLA FOWLER WARE |
| ATTORNEYS FOR APPELLEE: | CHARLES E. WINFIELD |
| | MALENDA HARRIS MEACHAM |
| | ASHLYN BROWN MATTHEWS |
| NATURE OF THE CASE: | CIVIL - DOMESTIC RELATIONS |
| DISPOSITION: | AFFIRMED IN PART, REVERSED AND REMANDED IN PART, AND REVERSED AND RENDERED IN PART - 03/26/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLTON, P.J., FOR THE COURT:**

¶1.  Christopher Vandenbrook (Chris) appeals the judgment of the DeSoto County Chancery Court that, among other things, (1) awarded custody of the parties' minor children to his wife, Charlotte Emma Vandenbrook[1] (Emma), (2) ordered Chris to pay Emma child support, but denied him the right to claim any of the children on his tax return, and (3) adjudicated Chris in contempt and awarded attorney's fees to Emma.

---

[1] Emma now goes by the last name "McKinney," which we assume is her maiden name because she is still legally married to Chris.

¶2. After our review, we find as follows: we affirm the chancellor's custody determination; we reverse and remand the chancellor's award of child support and retroactive child support; we affirm the chancellor's award of the tax exemption to Emma and denial of Chris's motion for reconsideration with respect to Chris's request to offer additional evidence regarding his W-2; we affirm the chancellor's decision to exclude the photographs of the marital home from evidence; and we reverse and render the chancellor's judgment finding Chris in contempt as well as the chancellor's award of attorney's fees to Emma in the contempt action.

**FACTS**

¶3. Emma and Chris were married on January 14, 2000, in Paducah, Kentucky. Three male children were born to the parties. During the marriage, the parties lived in Kentucky, North Carolina, Missouri, and Mississippi. Chris worked during the marriage and was the primary breadwinner, while Emma was primarily a stay-at-home parent.

¶4. On April 23, 2014, Emma filed a complaint for divorce and temporary relief on the grounds of habitual cruel and inhuman treatment, constructive desertion, or irreconcilable differences. Emma requested custody of the parties' three minor children, child support, permanent alimony, and an equitable division of the marital assets. She also requested separate maintenance. Chris filed an answer and a counterclaim but later withdrew it. The chancellor entered a temporary order on April 5, 2016, ordering Chris to pay Emma temporary child support in the amount of $1,400 per month and to pay for Emma's

2

automobile note and insurance. The temporary order also allowed Emma to move back into the marital home with Chris if she chose to do so, and both parties were enjoined from removing any property from the marital home.

¶5. After several continuances, the matter was set for trial, and Emma filed a petition for contempt against Chris, alleging that he had violated the temporary order by exercising stock options. Emma's petition was set for hearing on the date of the trial.

¶6. A trial was held on December 13, 2016. Emma presented her case and evidence to support her grounds for divorce, and at the conclusion of Emma's case, Chris moved for an involuntary dismissal of Emma's complaint pursuant to Rule 41 of the Mississippi Rules of Civil Procedure.

¶7. On December 15, 2016, the chancellor made a bench ruling granting Chris's Rule 41 motion and dismissing Emma's complaint for divorce on the grounds of habitual cruel and inhuman treatment. The chancellor also found Chris in contempt of the temporary order for selling stock options without obtaining approval or permission of the court.

¶8. Regarding child custody, the chancellor conducted an *Albright*[2] analysis and found it was in the children's best interest to grant Chris and Emma joint legal custody, with Emma having physical custody and Chris having certain periods of visitation. The chancellor ordered Chris to pay Emma $3,690 per month in child support; maintain health, vision, and dental insurance on the minor children, and be responsible for seventy-five percent of all

---

[2] *Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

medical expenses not covered by insurance. The chancellor also ordered Chris to pay Emma $49,730 in retroactive child support. Additionally, the chancellor ordered Chris to pay Emma attorney's fees in the amount of $29,346.06 for the divorce and $2,500 in attorney's fees for the contempt action. On January 3, 2017, the chancellor entered an order memorializing her bench ruling.

¶9.     Both Emma and Chris filed motions for reconsideration, seeking to alter or amend the judgment pursuant to Rule 59 of the Mississippi Rules of Civil Procedure. Emma also filed a motion for additional attorney's fees, and Chris filed a separate motion for relief from the judgment pursuant to Mississippi Rule of Civil Procedure 60(b). Following a hearing on the motions, the chancellor took them under advisement, and on June 1, 2017, the chancellor entered her order denying Chris's motions and granting in part and denying in part Emma's motion, stating that the denial of a divorce was proper. The order also denied Emma's request for additional attorney's fees. Chris appeals from the final order and the denial of his posttrial motions.

**DISCUSSION**

¶10.    "A chancellor's findings will not be disturbed on appeal 'when supported by substantial evidence unless the chancellor abused [her] discretion, was manifestly wrong, clearly erroneous[,] or an erroneous legal standard was applied.'" *Powell v. Powell*, 976 So. 2d 358, 361 (¶10) (Miss. Ct. App. 2008) (quoting *Sanderson v. Sanderson*, 824 So. 2d 623, 625-26 (¶8) (Miss. 2002)). "However, where the chancellor improperly considers and

4

applies the *Albright* factors, an appellate court is obliged to find the chancellor in error." *Collins v. Collins*, 98 So. 3d 506, 507 (¶7) (Miss. Ct. App. 2012). "It is for the chancellor to determine the credibility and weight of the evidence." *Divers v. Divers*, 856 So. 2d 370, 373 (¶9) (Miss. Ct. App. 2003).

## I. Custody

¶11.    In custody matters, the Mississippi Supreme Court has established the following guidelines to assist chancellors in making considerations regarding the best interest of children:

> We reaffirm the rule that the polestar consideration in child[-]custody cases is the best interest and welfare of the child. The age of the child is subordinated to that rule and is but one factor to be considered. Age should carry no greater weight than other factors to be considered, such as: health[] and sex of the child; a determination of the parent that has had the continuity of care prior to the separation; which has the best parenting skills and which has the willingness and capacity to provide primary child care; the employment of the parent and responsibilities of that employment; physical and mental health and age of the parents; emotional ties of parent and child; moral fitness of [the] parents; the home, school[,] and community record of the child; the preference of the child at the age sufficient to express a preference by law; stability of home environment and employment of each parent[;] and other factors relevant to the parent-child relationship.

*Albright*, 437 So. 2d at 1005.[3]

¶12.    With these guidelines in mind, Chris concedes that the chancellor used the correct legal standard set forth in *Albright* to determine child custody, but he contends that she failed

---

[3] "A court which dismisses the complaint for divorce may still provide for the custody of the children if [the court] deems it necessary." *Waller v. Waller*, 754 So. 2d 1181, 1183 (¶12) (Miss. 2000).

to consider all of the evidence introduced at trial on those factors. He further contends that the chancellor failed to give the appropriate weight to several factors. As a result, Chris argues that the chancellor erred when she awarded physical custody of the children to Emma.[4] Emma, however, asserts that the chancellor employed her subjective judgment of the witnesses' credibility, assessed the wide-ranging evidence before her, and acted within her discretion in awarding custody of the minor children.

¶13. The chancellor found that five of the *Albright* factors favored Emma (continuity of care; parenting skills; employment and responsibilities of employment; emotional ties with children; and preference of two oldest children) and that only one of the factors favored Chris (sex of the children).[5] The chancellor found that the remaining six factors favored neither parent over the other (health of the children; willingness and capacity to be the primary care giver; age, physical health, and mental health of each parent; moral fitness; home, school, and community records of children; and stability of home environment and employment).

### A. Age, Health, and Sex of the Children

¶14. Chris contends that this factor clearly favored him because all of the children are male. He relies on *Flowers v. Flowers*, 90 So. 3d 672, 680 (¶32) (Miss. Ct. App. 2012), which states that "when the health aspect is neutral, the child's gender in relation to that of the

---

[4] As stated, the chancellor ruled that the parties would share joint legal custody of the minor children with Emma having physical custody.

[5] Although the chancellor stated that the sex of the children slightly favored Chris, she ultimately ruled that this issue was neutral.

parent is clearly relevant. Furthermore, this Court has upheld a chancellor's determination on this factor based solely on gender."

¶15. The chancellor in the present case reasoned that all the children appeared to be in good health, because she did not hear any evidence to the contrary. She adduced that the health of the children did not favor either party. Since the children are all male, she found that this "factor might slightly favor [Chris]." She found that the health of the children did not favor either party. We find no abuse of discretion as to this factor.

### B. Continuity of Care

¶16. The chancellor stated the following: "[This] factor strongly favors the mother. The mother [has been] a stay-at-home mom for the majority of the life of these children. And so she continued to have the children, even during periods of separation she has still seemed to exercise the continuity of care of the children." Chris asserts that this factor should not default to a stay-at-home mom. He further asserts that although Emma was a stay-at-home mom, "she spent much time during the marriage traveling back and forth to Kentucky, partying with friends, pursuing extramarital relationships, and on her phone texting or calling individuals."

¶17. Emma responds that the chancellor's finding on this factor is supported by substantial evidence and therefore should be affirmed. Despite Chris's arguments, it is the chancellor's job to determine the credibility and weight of the evidence. Based our review of the record, her decision was supported by substantial evidence and will not be disturbed.

7

### C.    Parenting Skills

¶18.    According to the chancellor, based on the limited testimony with respect to this factor, this factor favored Emma because she was the primary care giver for the children.  She found the parties had equal ability and capacity to provide childcare. The chancellor spoke briefly on the record about some of the issues that she had heard during the testimony, such as the children obtaining driver's licenses and school issues.  In arriving at her decision, the chancellor stated:

> Mom is the one that, you know, did the parenting issues.  So I think that factor slightly favors the mom.  As I said, I didn't hear anything except maybe some relationship issues between dad and the boys that would lead me to believe and that maybe he yelled a lot, you know, that his parenting skills were deficient except maybe they are just different from mom[']s.  But, as I said, I think this factor slightly favors the mom.

Chris contends that Emma demonstrated poor parenting skills and made poor decisions affecting the children during the marriage.  He argues that she did not know how many classes their oldest son had left before he could get his high school diploma, and that she refused to give him the birth certificates and social security numbers for their oldest two boys so they could obtain their driver's licenses.  Chris asserts that he is in a "much more capable and positive position to model the values the boys need in order to transition into a productive adulthood."

¶19.    After our review, we find that the record contains substantial evidence to support the chancellor's decision; therefore, the decision will not be disturbed.

### D.    Employment Responsibilities

8

¶20. The chancellor found that, considering the testimony regarding the amount of time that Chris would spend out of the home working, this factor slightly favored Emma. She stated that "the testimony was that dad would have to leave at six or six-thirty -- the child said one thing and dad said another thing -- in the morning and get home anywhere between six-thirty and nine-thirty at night." There was also testimony that Emma worked less hours and would be home more often than Chris. We find substantial evidence in the record supports the chancellor's decision; therefore, it will not be disturbed.

### E. Physical and Mental Health and Age of the Parents

¶21. The chancellor found that this factor favored neither parent. She did make note of medical records that were introduced by Chris challenging Emma's mental state; however, she stated that she made a determination that, after reviewing the records, Emma was never diagnosed with a mental defect. We find substantial evidence in the record supports the chancellor's decision; therefore, it will not be disturbed.

### F. Emotional Ties of Parent and Child

¶22. The chancellor found that this factor strongly favored Emma based on the preference of the two oldest children, expressed in their affidavits, as to live with her. We find substantial evidence in the record supports the chancellor's decision; therefore, it will not be disturbed.

### G. Moral Fitness of the Parents

¶23. The chancellor briefly discussed the parties' sexual proclivities, which they testified

about extensively, and ultimately determined that their moral fitness was not outcome determinative as to this factor. She further stated, "I don't think -- I think with regard to their moral fitness they probably are rather equal. Quite honestly, I believe both of them this court had an issue with truthfulness. I don't think either one of them sat up here and told me the truth about everything." We find substantial evidence in the record supports the chancellor's decision; therefore, it will not be disturbed.

### H. Home, School, and Community Record of the Child

¶24. The chancellor found that there was not a lot of the testimony presented regarding this factor—only that one of the children had been kicked out of school—and limited testimony about their home life. Therefore, she found that this factor favored neither parent. We find substantial evidence in the record supports the chancellor's decision; therefore, it will not be disturbed.

### I. Preference of Child

¶25. According to the chancellor, both of the older children signed a preference that was filed with the court, stating that they wanted to live with Emma. We find substantial evidence in the record supports the chancellor's decision; therefore, it will not be disturbed.

### J. Stability of Home Environment

¶26. The chancellor noted that Chris has been out in the workforce longer, so this factor slightly favored him; however, she also stated that Emma just reentered the workforce and seemed to have a stable home. Based on that finding, she found this factor favored neither

10

parent. The record reflects substantial evidence to support this finding, and therefore it will not be disturbed.

¶27. Our review of the record reflects that the custody award by the chancellor was supported by substantial evidence. Given our deferential standard of review, we find the chancellor did not abuse her discretion. Therefore, we affirm the chancellor's judgment on this issue.

## II. Child Support

¶28. "[T]he process of weighing evidence and arriving at an award of child support is essentially an exercise in fact-finding, which customarily significantly restrains [the appellate] [c]ourt's review." *Clausel v. Clausel*, 714 So. 2d 265, 266-67 (¶6) (Miss. 1998). At the time of trial, the Vandenbrooks had three minor children. The chancellor calculated Chris's monthly adjusted gross income (AGI) at $16,785.50 per month and ordered him to pay $3,690 per month in child support. Mississippi's statutory child-support guidelines create a rebuttable presumption that the non-custodial parent should pay twenty-two percent of his AGI for the support of three minor children. Miss. Code Ann. § 43-19-101(1) (Rev. 2015). It is uncontested that Chris's income exceeds $100,000 per year. Section 43-19-101(4) provides that "[i]n cases in which the [AGI]. . . is more than One Hundred Thousand Dollars ($100,000) . . . the court *shall* make a written finding in the record as to whether or not the application of the guidelines established in this section is reasonable." (Emphasis added). Chris argues that the chancellor's award was unreasonable, and she did

11

not provide findings as to why the award was reasonable in accordance with section 43-19-101.[6]

¶29.    Chris asserts that the payments should have been established at twenty-two percent of his base monthly income, with an addtitional twenty-two percent to be paid from any amount received as a bonus or from the exercise of a stock option.  However, the chancellor averaged Chris's AGI for the four years preceding the year of the divorce by including amounts he received as bonuses and from the exercise of stock options.  Chris contends that the chancellor erred in this regard.  He asserts that he had a net income of $7,558.18 per month and expenses of $5,872.79 which left him with a monthly surplus of only $1,685.39.  He further contends that once he pays the $3,690 monthly child-support award, the health insurance premiums, plus seventy-five percent of all out-of-pocket medical expenses for the children, he will be at a huge deficit each month.  As such, he requests that this Court reverse the child-support award and remand the case for a proper application of the guidelines to arrive at the amount of child support that is due.

¶30.    Emma responds that the chancellor was within her discretion in not making reductions to Chris's child support obligations.  "When a chancellor makes a ruling without specific

_____

[6] The record reflects that in his posttrial motion for reconsideration, seeking to alter or amend the judgment, and for relief from judgment, Chris requested that the chancellor amend her order in accordance with Mississippi Code Annotated Section 43-19-101(4) and make a written finding in the record and discuss the reasonableness of the child support award.  In the chancellor's order denying Chris's motion, the chancellor failed to specifically address Chris's request for written findings.  Instead, she held that "[t]he [c]ourt's ruling on child support, child custody, and attorney's fees was proper."

12

findings of fact, this [c]ourt assumes that the chancellor resolved any factual disputes in favor of the appellee." *Bredemeier v. Jackson*, 689 So. 2d 770, 777-78 (Miss. 1997). Section 43-19-101(3)(a) instructs that gross income is calculated "from all potential sources that may reasonably be expected to be available to the absent parent." In *Roberts v. Roberts*, 924 So. 2d 550, 553 (¶5) (Miss. Ct. App. 2005), this Court held that "[b]ecause Mr. Roberts'[s] income fluctuated, the chancery court used a three-year income average to determine the applicable amount of child support. Where income tends to fluctuate, a chancellor may use income averaging to calculate applicable child support." Emma asserts in her brief that Chris's total average AGI over 2013, 2014, 2015, and 2016 was $201,425.97. When divided over twelve months, his monthly AGI equals $16,785.50. Twenty-two percent of that monthly AGI equals $3,692.81. The chancellor slightly reduced the award to $3,690.00 for the sake of having an even number, which resulted in her award amount.

¶31. The chancellor found that Chris reasonably expected to receive bonuses and stock options, because Chris acknowledged that he received them every year. The chancellor stated in her findings that if Chris no longer receives bonuses or other incentives, he may petition the court to adjust his child-support obligation based upon a material change in circumstances. If Chris desired to claim financial inability to pay the child support that the chancellor awarded, it was his burden to establish that claim. *Masino v. Masino*, 829 So. 2d 1267, 1273 (¶28) (Miss. Ct. App. 2002).

¶32. Since Chris's income exceeded $100,000, the chancellor was required to make

written findings as to whether the application of the guidelines was reasonable—in compliance with section 43-19-101(4). The chancellor failed to do so. Therefore, we reverse that aspect of the chancellor's judgment and remand this issue for a determination as to whether the statutory guidelines should apply along with a determination of the amount of support to be paid.

### III.    Tax Exemptions

¶33.    Chris argues that Emma had no significant income from which she would have any advantage in claiming the dependent child exemption, so the chancellor erred in not awarding him the deductions. The chancellor's original order was silent as to the tax exemptions. A decision that does not address the exemption leaves the deduction with the custodial parent. *See* Deborah H. Bell, *Mississippi Family Law* §13.08[1] at 451 (2d ed. 2011).

¶34.    Emma responds that the chancellor was not required to give him the exemption; therefore, she did not err in failing to do so. In response to Chris's argument that she "had no significant income, which would make it advantageous to her to be able to claim the exemption," Emma asserts that income is not the deciding factor when it comes to deciding who should be given the exemption. Also relevant is the "non-economic but nevertheless valuable contributions contributed by the custodial parent." *Louk v. Louk*, 761 So. 2d 878, 884 (¶17) (Miss. 2000). Notwithstanding that Emma did not earn as much money as Chris, she was still bringing in income through her work as a full-time licensed practical nurse (LPN). This Court in *Neelly v. Neelly*, 213 So. 3d 539, 542 (¶9) (Miss. Ct. App. 2016),

14

discussed similar circumstances—although not directly on point—and listed examples of

factors that chancellors could consider in awarding income-tax exemptions:

> [I]ncome-tax exemptions are typically most valuable to the party in the higher tax bracket and can be worthless to a party with little or no income. Chancellors can construct an order for child support that equitably takes into consideration which party received the benefit of the tax advantage, while maximizing the overall income available to benefit the child. [*Nichols v. Tedder,* 547 So. 2d 766, 776 (Miss. 1989)]; *see also Louk*, 761 So. 2d at 884 (¶17) (enumerating various factors chancellors can consider when allocating tax exemptions, including noneconomic contributions by the custodial parent, the value of the exception at the marginal tax rate of each parent, the income of each parent, the age of the child and how long the exemption will be available, the percentage of the cost of supporting the child borne by each parent, and the financial burden assumed by each parent under the property settlement in the case).

As the higher-income earner, the exemption would have been more beneficial to Chris. Even

so, we cannot say that the chancellor abused her discretion in awarding Emma the tax

exemptions for the children.

### IV.    Retroactive Child Support

¶35.    The chancellor ordered Chris to pay retroactive child support for the months of May

2015 through December 2016 (with the exception of July and August in 2016 when Emma

was living in the home). In ordering the retroactive child support, the chancellor stated:

> So I am going to award retroactive child support for the [seventeen] months that she has been -- they have been separated. That two of those months, I mean, they basically been separated for 19 months through December. July, and August she was living back in the home, so I'm not using those months. So the retroactive child support is $49,730[,] and I'm giving Emma a judgment against Chris in that amount[,] and the judgment is to be payable within [ten] days of the date of this order. Chris has got quite a bit of money from the stock option that he exercised in an account, so he's got the ability to pay that

15

immediately.

A temporary order entered by the court on April 5, 2016, stated that any issues concerning retroactive support would be considered at trial. The chancellor, in accordance with her express intent to do so, considered and awarded retroactive child support following the trial on the merits. Emma asserts that the chancellor's award was not an abuse of discretion because she applied the same child-support calculation that was set based upon a reasonable average of Chris's AGI, and she applied credits for support Chris had already paid under the prior order in place. She further asserts that Chris is not entitled to receive credit for amounts she received that were not for the support of their children. She also contends that Chris did not make an on-the-record objection challenging the award and should be prevented from addressing this issue on appeal. *See Strong v. Strong*, 981 So. 2d 1052, 1054 (¶¶13-15) (Miss. Ct. App. 2008).

¶36. Chris argues that the calculation was incorrect because the chancellor used the incorrect AGI and she did not give him proper credit for other money that he paid Emma during that time period. Chris also alleges that Emma received a partial distribution of the stock sold in 2016 in the amount of $29,000 and tax refunds during the divorce action in the amount of $7,000. Additionally, he argues that Emma never specifically requested any retroactive child support in any pleadings; therefore, the chancellor should not have included it. Since we are reversing the child-support award because the chancellor failed to make written findings as to whether the application of the guidelines was reasonable, the issue as

16

to the amount of retroactive child support shall be subject to the same review and reversed as well.

## V. W-2 Deductions

¶37. Chris argues that the chancellor erred in not allowing him to present additional testimony regarding the explanation of the numbers on his W-2. During the hearing on his motion for reconsideration, he requested that the chancellor allow him to introduce his 2016 year-end pay stub into evidence and allow an additional witness to testify and explain what the different numbers on this pay stub meant. During trial testimony, the parties disagreed regarding the meaning of some of the numbers on Chris's W-2. He contends that if the chancellor would have allowed him to introduce his year-end pay stub and the testimony of the additional witness, the chancellor could have arrived at the correct child-support amount.

¶38. Emma argues that no matter how the amounts are classified—whether as deferred compensation or allocations toward health insurance coverage—the total amount still qualifies as income for purposes of calculating Chris's child-support obligation. She further argues that subsection three of Rule 59 is the only feasible place that Chris's claim could be substantiated, but there was no error of law and there is no manifest injustice that justified granting his motion.

¶39. A chancellor's denial of a motion for reconsideration under Rule 59 is reviewed for an abuse of discretion. *Ferguson v. Miss. Farm Bureau Cas. Ins. Co.*, 147 So. 3d 374, 377 (¶11) (Miss. Ct. App. 2014). We do not find that the chancellor abused her considerable

17

discretion when she refused to reopen the case and allow additional testimony or documentary evidence. Chris has offered no reason as to why he could not have offered the additional witness and documentary evidence during the initial trial proceedings. We therefore agree that the chancellor did not abuse her discretion in denying his motion with respect to this issue. "The [c]ourt has the discretion to order a rehearing or to alter or amend the judgment if convinced that a mistake of law or fact has been made, or that injustice would attend allowing the judgment to stand." *Roebuck v. Massey*, 741 So. 2d 375, 387-88 (¶38) (Miss. 1999) (quoting *Mayoza v. Mayoza*, 526 So. 2d 547, 549 (Miss. 1988)).

## VI. Photograph Evidence

¶40. Next, Chris contends that the chancellor erred in not admitting photographs of the condition of the marital home into evidence. The chancellor refused to allow the photographs into evidence unless Chris could state the precise date the photographs had been taken. Chris had previously testified that he began taking the photographs at the time Emma filed for divorce, but he did not have his cell phone with the photographs present, and the chancellor did allow him more time to retrieve it. He contends that he satisfied the requirements of Mississippi Rules of Evidence 1001(d) and 901(b)(l) and therefore the chancellor should have allowed the photographs into evidence.

¶41. A chancellor's decision not to admit evidence will not be overturned unless the chancellor abused her discretion to such an extent that a party has been prejudiced. *In re Estate of Laughter*, 23 So. 3d 1055, 1064 (¶42) (Miss. 2009). By asking Chris to authenticate

18

the photographs by verifying the dates they were taken, the chancellor was merely requiring that Chris produce sufficient evidence to support a finding that the photographs were what he claimed they were.

¶42. We find error, albeit harmless error, in the chancellor not admitting the photographs into evidence. Mississippi Rule of Evidence 901(a) states: "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Chris testified that he started taking the photographs from the time that Emma filed for divorce, and he testified that he took all the pictures himself. He further testified that they depict the condition of the marital home during a time that Emma was living there. We find that his testimony was sufficient to satisfy Rule 901(a) and that the court should have admitted the photographs. Even so, "[i]n order for a case to be reversed on the admission or exclusion of evidence, it must result in prejudice and harm or adversely affect a substantial right of a party." *Bower v. Bower*, 758 So. 2d 405, 415 (¶46) (Miss. 2000). Although we find error, we deem it to be harmless. "The chancellor has the sole responsibility to determine the credibility of witnesses and evidence, and the weight to be given each." *Lee v. Lee*, 798 So. 2d 1284, 1288 (¶14) (Miss. 2001). With this precedent in mind, we do not find that the exclusion of the photographs would have affected the chancellor's custody determination.

## VII. Contempt

¶43. "The standard of review for civil contempt on appeal is manifest error, meaning the

factual findings of the chancellor are affirmed unless manifest error is present and apparent." *Stallings v. Allen*, 201 So. 3d 500, 504 (¶14) (Miss. Ct. App. 2016) (internal quotation marks omitted). The Mississippi Supreme Court has held that contempt must be willful. *Mizell v. Mizell*, 708 So. 2d 55, 64 (¶52) (Miss. 1998). "A contempt citation is proper only when the contemnor has willfully and deliberately ignored the order of the court." *Id*. (quoting *Cooper v. Keyes*, 510 So. 2d 518, 519 (Miss. 1987)). "It is a defense to a contempt proceeding that the person was not guilty of willful or deliberate violations of a prior judgment or decree." *Id*. (citing *Dunaway v. Busbin*, 498 So. 2d 1218, 1222 (Miss. 1986)). Emma filed a motion to hold Chris in contempt for his selling of 19,000 shares of stock for approximately $250,000 in violation of the protective order.

¶44. Chris contends that, based on the language of the orders, he did not believe he was violating the previous court orders when he exercised the stock options. He reasons that the chancellor should have denied Emma's request that he be found in contempt. The language in both orders states that "both parties are restrained and enjoined from transferring, assigning, borrowing against, concealing or in any way dissipating or disposing of any marital property." The chancellor stated that Chris "could have come in and just filed a petition [and] asked the [c]ourt to do it just as they had or discussed it. The lawyers discussed it and signed an agreed order allowing him to do it." Since he did not get the court's permission, she found him in contempt for violating the temporary order.

¶45. We find that the chancellor erred in finding Chris in contempt. As stated, one must

20

willfully violate an unambiguous order to be held in contempt. Also, the order of which the defendant is accused of willfully disobeying must be clear and unambiguous. The record is clear that the ultimate purpose of the orders was to prevent any dissipation of assets, and that did not happen. It is true, as the chancellor found, that Chris violated the express language of the order prohibiting the transfer of assets, but the transfer language must be read in conjunction with the other language: "or in any way dissipating or disposing of any marital property." Given the fact that the chancellor found that Chris's action in exercising the stock option did not constitute a dissipation of the assets, we find the chancellor erred in finding Chris in contempt. In finding Chris in contempt, this is what the chancellor said regarding dissipation:

> And [Chris] did—in fact, he did not dissipate these assets. I do want to give [Chris] credit for that. And [Chris's attorney] argued very strongly on [Chris's] part that he did not dissipate these assets. And, in fact, no harm was done. In fact, [Chris] testified that the price of the stock has gone down, that he actually preserved—his argument is that he actually preserved an asset of the estate by exercising the stock option and selling the stock at the time that he did.

As noted, the chancellor said that if Chris had filed a petition to sell the stock, she would have allowed it. According to Chris, he saved approximately $40,000 by taking the action that he did, and this assertion is not disputed in the record. Based on the wording of the orders, it is clear to us that Chris or any reasonable person could conclude that the purpose of the orders was to preserve the assets and to not dissipate any marital assets. A plain reading of the text of the orders could be interpreted as prohibiting transfers that would

21

dissipate martial property. Because Chris's action actually preserved the assets of the marital estate—which was the purpose of the orders—we find that it was error to hold him in contempt. Therefore, we reverse and render that portion of the judgment finding him in contempt.

### VIII. Attorney's Fees[7]

¶46. "The award of attorney's fees in divorce cases is left to the discretion of the chancellor, assuming [s]he follows the appropriate standards." *Speights v. Speights*, 126 So. 3d 76, 81 (¶15) (Miss. Ct. App. 2013) (quoting *Creekmore v. Creekmore*, 651 So. 2d 513, 520 (Miss. 1995)). A chancellor's award or denial of fees should be supported by findings of fact regarding the *McKee*[8] factors. *Grice v. Grice*, 726 So. 2d 1242, 1255 (¶51) (Miss. Ct. App. 1999); *Weeks v. Weeks*, 29 So. 3d 80, 92-93 (¶¶57-59) (Miss. Ct. App. 2009) (denial of fees remanded for failure to consider the *McKee* factors). Chris argues that the chancellor simply stated that according to the *McKee* factors, Emma was not able to pay her attorney, and the chancellor did not discuss the factors in detail on the record. He further argues that Emma never proved that she could not pay her attorney's fees. "The party seeking attorney's fees is charged with the burden of proving inability to pay; usually where the party is able to pay his or her own attorney's fees, an award of such fees is inappropriate." *Duncan v.*

---

[7] In a motion to supplement the record on appeal, Chris argues that while this appeal was pending, Emma filed for bankruptcy and obtained a discharge of the attorney's fees at issue. The chancery court should address this issue on remand.

[8] *McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982) (outlining guidelines to be considered by the court when determining the reasonableness of attorney's fees).

*Duncan*, 915 So. 2d 1124, 1128 (¶16) (Miss. Ct. App. 2005) (citing *Riley v. Riley*, 846 So. 2d 282, 287-88 (¶23) (Miss. Ct. App. 2003)).

¶47.    Although the chancellor mentioned the *McKee* factors, she provided no specific explanation for her finding that Emma could not pay her attorney, especially coupled with her finding that Emma was stable and working. In *McKee*, 418 So. 2d at 767, the supreme court held that the following factors provide the guidelines to determine the reasonableness of attorney's fees in domestic cases:

> The fee depends on consideration of, in addition to the relative financial ability of the parties, the skill and standing of the attorney employed, the nature of the case and novelty and difficulty of the questions at issue, as well as the degree of responsibility involved in the management of the cause, the time and labor required, the usual and customary charge in the community, and the preclusion of other employment by the attorney due to the acceptance of the case.

¶48.    In discussing the issue, the chancellor stated:

> With regard to attorney's fees, I know Chris has asked for an award of attorney[']s fees that I am denying. Chris definitely has the ability to pay his own attorney's fees. I am awarding Emma . . . attorney's fees of, according to the attorney's affidavit of $29,346.06. They have already paid some $12,000 or something. I can't remember the exact amount. It's stated on the affidavit. And this amount has already given Chris credit for that. But according to the *McKee* factors, you know, Emma has an inability to pay. Emma does not have the earning capacity that Chris has. And I know Mr. [Swayze] Alford made the argument or a statement—I don't know if it was argument—yesterday that Emma should not be awarded an attorney's fee for the divorce because she did not prevail on the divorce. She was not awarded a divorce. The Court did not find that the divorce should be granted because I did not find adequate grounds. However, this divorce has been going on for two years. All four attorneys, I think that because Ms. [D. Pace] Branan, Mr. Alford and Kayla [Ware] have been working for [Chris]. Although Ms. Branan has been going a lot longer[,] and she has been there for the long haul. And Ms. [Malenda] Meacham has been working for [Emma] for two years now and there's been

23

a lot of water under the bridge. At one time, and for the majority of this time, Emma was also defending a complaint for divorce because [Chris] had filed a cross-complaint. She's also been fighting for her kids and fighting for child custody and for child support. And so just the fact that she was not awarded a divorce does not negate the fact that this was a very complicated case. The exhibits alone indicate that. I mean, I've got one huge box of exhibits and then a stack of exhibits that's two-feet tall. So certainly the time and effort has been put into this by Ms. Meacham. This was a very complicated, unique case. And Emma, prior to just recently, has been a stay-at-home mom and has not had her own money, her own earnings. And so I feel like this is an appropriate case to award the attorney's fees. Also, I'm giving her a judg[]ment in that amount and that is to be payable within 10 days.

¶49. Based on our perusal of the record, the chancellor made no explicit findings addressing all of the *McKee* factors, either in her order, or on the record, but it can be surmised from the chancellor's statement that she had considered them.[9] The more perplexing question is not the reasonableness of the amount awarded, but the basis for finding that Emma was not able to pay it. As noted, the chancellor stated: "But according to the *McKee* factors, you know, Emma has an inability to pay." On the question of whether Emma had the ability to pay her own attorney's fees, the chancellor offered no analysis of Emma's financial condition that would support the conclusion that Emma was unable to pay them. During the chancellor's discussion of the custody issue, she stated the following: "[Emma] has just entered the work force again, but it sounds like she's got a stable job at this

---

[9] This Court in *Evans v. Evans*, 75 So. 3d 1083, 1090 (¶25) (Miss. Ct. App. 2011), stated the following: "While this [C]ourt has held that a chancellor's failure to apply the *McKee* factors is not necessarily itself reversible error, see *Miley v. Daniel*, 37 So. 3d 84, 87 (¶7) (Miss. Ct. App. 2009), the proof must at least support an accurate assessment of fees under the *McKee* criteria."

point. And it sounds like she has a stable home at this point." We note that Emma testified that she could not pay her attorney's fees. As stated, the burden was on Emma to prove that she could not pay her attorney's fees. Although the decision to award attorney's fees in a divorce proceeding is left to the sound discretion of the chancellor, there must be evidence undergirding the chancellor's decision that a party is unable to pay her attorney's fees before an award can be made. Here, we find the record lacks such evidence. Therefore, we find that the chancellor erred in awarding attorney's fees to Emma for the divorce proceeding, which ultimately resulted in Emma's complaint for the divorce being dismissed. Accordingly, we reverse and remand the chancellor's award of attorney's fees for the chancellor to determine whether Emma has the inability to pay and to apply the *McKee* factors with supporting findings.

¶50. The chancellor also awarded Emma $2,500 in attorney's fees for the contempt action that she filed against Chris. Since we have found that the chancellor erred in finding Chris in contempt, we also reverse and render this award.

¶51. **AFFIRMED IN PART, REVERSED AND REMANDED IN PART, AND REVERSED AND RENDERED IN PART.**

**BARNES, C.J., J. WILSON, P.J., GREENLEE, WESTBROOKS, TINDELL, McDONALD, LAWRENCE, McCARTY AND C. WILSON, JJ., CONCUR.**