ISHEE, J.,
for the Court:
¶ 1. In September 2010, the Forrest County Chancery Court granted Sharon Thompson Flowers and Allen Flowers a divorce based on irreconcilable differences. The chancery court awarded the parties joint legal custody of the two minor children and awarded primary physical custody of the children to Allen, with Sharon receiving liberal visitation. Sharon now appeals, arguing the chancery court erred by awarding Allen primary physical custody of the children. Sharon asserts the chancery court: (1) improperly sanctioned Sharon for a post-separation liaison; (2) failed to properly analyze the age-and-health-of-the-child factor in its Albright[1] analysis; (3) failed to determine which parent had the best parenting skills and capacity to provide primary child care; (4) failed to properly consider the school record of the children; and (5) placed undue emphasis on a factor of its own creation. Finding no error, we affirm.
FACTS AND PROCEDURAL HISTORY
112. Sharon and Allen were married in 2004. They have two minor children together, Charlie and Joseph. At the time *675 of the action, Charlie was ten years old and Joseph was six years old. On November 20, 2008, Allen filed a complaint for divorce on the grounds of adultery, desertion, and habitual cruel and inhuman treatment. He also sought a temporary restraining order (TRO) to prevent Sharon from taking the children to Texas, where her then-boyfriend was living. The petition for a TRO asserted that Sharon planned to take the children out of the state “for a sufficient amount of time to deprive [the chancery court] of jurisdiction over the children and extract a divorce from [Allen].” On November 21, 2008, the chancellor granted the petition for a TRO. The TRO was later dissolved, but the chancellor enjoined removal of the children from the jurisdiction without leave of court.
¶ 8. In a November 26, 2008 temporary order, the chancellor awarded the parties joint legal and physical custody of the minor children. The parties were to rotate custody on a weekly basis. Allen was ordered to pay child support to Sharon each month, the medical expenses for the minor children, and all reasonable expenses associated with the marital home. Because Allen was a practicing attorney in the Hattiesburg, Mississippi area, all of the local chancellors recused, and the Mississippi Supreme Court appointed the Honorable Larry Buffington to serve as chancellor in the case.
¶ 4. On May 6, 2009, the newly appointed chancellor issued a modified temporary order. The order lifted the prohibition on out-of-state travel but prevented the parties from “having the children in the presence of a boyfriend or girlfriend not related by blood or marriage[.]” It also required Allen to pay temporary alimony to Sharon. Finally, the order appointed a guardian ad litem (GAL) to represent the interests of the children.
¶ 5. On December 10, 2009, the parties filed a joint motion seeking a divorce based on irreconcilable differences. They requested that the chancery court determine all matters concerning the minor children. Accordingly, a trial was held to determine the proper custody arrangement.
¶ 6. On January 19, 2010, the trial began. A major issue in determining child custody involved which parent was the primary caregiver to the two minor children. During Sharon’s testimony, she alleged that she was the primary caregiver. According to Sharon, there were many mornings where Allen would leave for work between five and six o’clock in the morning and not return until five or six o’clock in the evening; he worked at least one day on the weekend every week; and he worked at night while she prepared the children for bed. However, she acknowledged that they would alternate reading to the children every night.
¶ 7. Sharon further testified that she did all of the chores around the house including: washing dishes, grocery shopping, cooking, washing and ironing clothes, organizing the house, planning birthday parties, decorating for holidays, and cleaning the house. Sharon noted that she took the children to the doctor and maintained their health and medications. She also stated that she did all of the Christmas shopping and acted as “Santa Clause” and the “Tooth Fairy.” In addition, Sharon asserted that Allen did not care for the children when they were infants. She alleged that he did not feed the children, change their diapers, or wash their clothes. She also claimed he refused to allow the children to sleep in the same room as him when they were infants.
118. Allen’s testimony at trial did not conform with Sharon’s account of the child rearing. While Allen admitted that Sharon handled most of the child-rearing re *676 sponsibilities when the children were infants, he maintained that he has become more involved as the children have grown older. He testified that he handles ninety percent or more of the children’s education and ninety-nine percent or more of the children’s religious training. Allen also alleged that he is the primary disciplinarian. He testified that Sharon said: “You’re going to have to discipline these boys. I can’t do anything with them.” While Allen acknowledged that Sharon is more “fun” than he is, he maintained that he performs many of the day-to-day parenting requirements. According to Allen, before the separation, Sharon prepared most of the meals and bought most of the clothing; however, the cleaning was fairly evenly split between the two of them, and he did all of the yard work.
¶ 9. Furthermore, Allen claimed that when Charlie began having trouble reading, he addressed the issue. He alleged that Sharon “wasn’t particularly interested in dealing with it.” According to Allen, testing revealed that Charlie has a phonemic awareness deficit, which he described as a problem where “letters don’t mean anything to [Charlie].”
¶ 10. Testimony at trial established that in September 2008, Allen altered his work schedule to accommodate Charlie’s needs. Allen began working from eight until four o’clock so that he could aid in Charlie’s studies each day. Upon discovering Charlie’s problems, Allen had Charlie tested by Deborah Thrash, a psychometrist, and arranged for Charlie to be tutored in the afternoons by his teacher, Elizabeth Lad-nier. Allen also had Joseph tested by a school psychometrist, who determined that Joseph had attention-deficit issues. Allen testified that when he had custody, Charlie was being tutored every day, barring the occasional off-day. He claimed that Sharon took Charlie to tutoring consistently during the school year, but that she did not follow through in the summer.
¶ 11. A second issue at trial was Allen’s use of multiple caregivers after the separation. Allen admitted receiving help with the children from multiple caregivers, including: Jerry Duckworth, Imogene Huffman, Sharon Hurley, Ladnier, and Allen’s uncle, Don Hegwood.[2] Because of his use of multiple caregivers, Sharon alleged the children do not have any structure when they are with Allen. The GAL agreed with this sentiment by testifying: “[I]t is a concern of mine because it does go to the boys — there’s a stability issue as far as who is going to be picking them up, who is going to be dropping them off.” She further stated “it would be better if he had one [caregiver].” Although the GAL recognized that only one caregiver should be used, she did not take this factor into consideration when assessing who should have primary physical custody.
¶ 12. Duckworth was the first caregiver introduced at trial. She testified that even before the separation, Allen asked her to be a “Christian role model” for the children. Subsequently, in 2007, Duckworth began to mentor the children by engaging in activities with them such as attending baseball games, going to the zoo, and visiting nursing homes. She asserted that Sharon was accepting of the relationship and that she and Sharon had become friends. Duckworth testified that from July 2008 through October 2008, a period of time before the separation, she was at the Flowerses’ house three to four weekends a month. Since the separation, she has “been there to assist [Allen] with the children or watch them while he worked.” She also testified that in the past she has helped Allen purchase Christmas presents.
*677 ¶ 13. Huffman was the next caregiver to testify at trial. She stated she kept the children on various occasions both prior to and after the separation. According to her description of her role, there was no set routine for when she cared for the children, but she mostly watched the children when they were unable to attend school due to illness.
¶ 14. Ladnier also testified at trial. Sharon asserts Ladnier is one of the children’s caregivers. However, Ladnier insisted that she is a tutor, which is quite different from a caregiver. She stated that she tutors Charlie on a consistent basis during the week. Ladnier did admit to taking Charlie to a restaurant and the movies as a reward for his hard work during tutoring.
¶ 15. A third issue at trial was Sharon’s relationship with Chris Scharbano. Allen testified that during the marriage Sharon had an affair with Scharbano, which continued after their separation. He alleged Scharbano had problems with alcoholism, and Sharon referred to - Scharbano as “my little drunk friend.” Sharon claimed the relationship was brief and that the children were never alone around Scharbano. In fact, according to Sharon, they had only been around him at one birthday party and one Christmas party. While the GAL stated that to her knowledge the affair had not adversely affected the children, Sharon had lied up until trial regarding the relationship. Hence, the GAL testified: “[Sharon] denied to me that she even had a relationship with [Scharbano], up until today, so there — I have no knowledge that it’s affected the children.” Accordingly, there was no real review before the chancery court regarding the effect of her relationship on the children.
¶ 16. During the trial, several experts testified regarding the parties’ mental states. Dr. Stanley G. Smith was appointed as an expert to evaluate the children. He testified that before assessing the children he assessed the parents, but was unable to complete the process with Sharon. Nonetheless, -he evaluated the children. He testified that Joseph had “anxiety, depression, anger, aggression, [and] post-traumatic stress issues.” Dr. Smith also found Joseph has attention-deficit disorder. According to Dr. Smith, when Joseph had anger issues in the past, Allen would “immediately intercede,” whereas Sharon would try to “smooth it over.” When Dr. Smith tested Charlie, he determined Charlie is hyperactive, aggressive, has some depression, and is “obviously dyslexic.” Dr. Smith acknowledged that “both children absolutely adore both parents”; however, he found that the joint-custody arrangement was causing considerable problems for the children. Based on the structure Allen provides, Dr. Smith opined he was the parent best suited for primary physical custody.
¶ 17. Dr. William Criss Lott was appointed to conduct psychological evaluations of the adult parties. With regard to Sharon, Dr. Lott stated that she showed signs of histrionic personality traits. He found Allen had an elevation on the compulsive scales. According to Dr. Lott, these traits have both positive and negative aspects.
¶ 18. Dr. Beverly Stubblefield was the final expert to testify regarding the parties psychological evaluations. She found that Sharon had borderline personality disorder, passive-aggressive personality traits, histrionic traits, and antisocial traits. Dr. Stubblefield also found that Allen had passive-aggressive personality traits. She did not discuss how these traits affected the children.
¶ 19. At trial, the GAL provided her opinion regarding which parent should have custody. In her initial report, the *678 GAL had recommended that Allen receive physical custody and Sharon have supervised visitation; however, the GAL later found supervised visitation unnecessary. In conducting an Albright analysis, the GAL determined five factors favored Allen, one factor favored Sharon, and all other factors were neutral. The GAL found the health and sex of the children favored Allen because both of the children are male. The continuity-of-care factor favored Sharon because of her status as the stay-at-home parent during the marriage. Based on the reports from the doctors, the GAL concluded the physical and mental health of the parties favored Allen. The moral-fitness-of-the-parents factor also favored Allen because of Sharon’s affair with Scharbano. According to the GAL, the home, school, and community record favored Allen because he was continuing to reside in the marital home; thus, the children would remain in their current school district. Allen is also the parent who deals with Charlie’s tutoring, and Allen is more involved in both children’s schooling. Because Allen is keeping the marital residence and maintains stable employment, the GAL stated the stability of the home environment and employment of each parent also favored Allen. Ultimately, based on these factors, the GAL recommended that the parties share joint legal custody and that Allen be granted primary physical custody, with Sharon receiving visitation rights.
¶20. On September 1, 2010, the chancery court granted the divorce based on irreconcilable differences. With regard to the Albright factors, the chancellor found: seven factors were neutral; the continuity-of-care factor favored Sharon because she stayed home with the children during the marriage; the health-and-sex-of-the-child factor[3] favored Allen because both children are male; the moral-fitness factor favored Allen because of Sharon’s affair; the factor regarding the home, school, and community record favored Allen because the children are of school age and have been attending school in the marital home’s district; and the final factor for other relevant considerations favored Allen based on Charlie’s unique tutoring situation. Accordingly, the parties were to share joint legal custody, and Allen was awarded primary physical custody. Sharon received visitation every other weekend and during the summer months when the children were not in school. During the summer months when Sharon had the children, Allen was entitled to custody every other weekend and one week of vacation. The chancery court also ordered detailed custody arrangements for various holidays.
¶ 21. On appeal, Sharon argues the following regarding the chancellor’s decision: (1) the chancery court improperly sanctioned Sharon for a post-separation liaison; (2) the chancery court failed to properly analyze the age-and-health-of-the-child factor; (3) the chancery court failed to determine which parent had the best parenting skills and capacity to provide primary child care; (4) the chancery court failed to properly consider the school record of the children; and (5) the chancery court placed undue emphasis on a factor of its own creation.
DISCUSSION
If 22. “[I]n custody cases, [appellate courts] are bound by the limits of our *679 standard of review and may reverse only when the decision of the trial court was manifestly wrong or clearly erroneous, or an erroneous legal standard was employed.” Hensarling v. Hensarling, 824 So.2d 583, 587 (¶ 8) (Miss.2002) (citations omitted). “Like the chancellor, our polestar consideration must be the best interest of the child. However, it is not our role to substitute our judgment for his.” Id.
¶ 23. The Mississippi Supreme Court has announced the following factors for a chancellor to consider when making a determination regarding child custody:
(1) age, health, and sex of the child; (2) a determination of the parent who had the continuity of care prior to the separation; (3) which parent has the best parenting skills and which parent has the willingness and capacity to provide primary child care; (4) the employment of the parent and responsibilities of that employment; (5) the physical and mental health and age of the parents; (6) the emotional ties of parent and child; (7) the moral fitness of the parents; (8) the home, school, and community record of the child; (9) the preference of the child at the age sufficient to express a preference by law; (10) the stability of home environment and employment of each parent; and (11) other factors relevant to the parent-child relationship.
White v. White, 26 So.3d 342, 351 (¶ 28) (Miss.2010) (citing Albright v. Albright, 437 So.2d 1003, 1005 (Miss.1983)). While the chancellor should consider the above factors in determining child custody, “the polestar consideration in child custody cases is the best interest and welfare of the child.” Id. The chancellor’s determination regarding five of the Albright factors is at issue in this case.
I. Moral Fitness of Parents
¶ 24. In determining that the moral-fitness-of-the-parents factor favored Allen, the chancery court stated: “[A]l-though both parties expressed questions as to the other having affairs, the evidence presented at trial by the admission of Sharon having had an affair after the separation of the parties, provides more than speculation. Based on this, this factor favors the father.” Sharon argues the trial court improperly sanctioned her for a post-separation liaison.
¶ 25. As support for her argument, Sharon cites Carr. v. Carr, 480 So.2d 1120 (Miss.1985). In Carr, the chancellor found both parents fit to have custody, but ultimately awarded physical custody to the father based on the mother’s adultery. The Mississippi Supreme Court held: “[T]he fact of adultery alone does not disqualify a parent from custodianship!;,] but ... the polestar consideration in original custody determinations is the best interest and welfare of the minor child.” Carr, 480 So.2d at 1121. However, the supreme court nonetheless upheld the chancellor’s decision stating: “It is apparent that the analysis considered adultery as but one factor in the overall consideration.” Id. at 1123.
¶ 26. Furthermore, the supreme court noted that the “moral fitness of a parent encompasses the charge of adultery.” Id. While acknowledging adultery as an action to consider under the moral-fitness prong, the supreme court reasoned the adultery “may be an unwholesome influence and an impairment to the child’s best interest, but on the other hand, may have no effect.” Accordingly, while adultery may be considered, the appropriate consideration is its effect on the children.
¶ 27. In the instant case, the chancellor found four Albright factors favored Allen and one Albright factor favored Sharon. *680 Thus, the adultery was but one factor in the overall consideration. Even if the chancellor had not found the moral-fitness-of-the-parents factor favored Allen, he nonetheless would have had three factors in his favor. Therefore, Sharon’s adultery was not the decisive factor regarding custody.
¶ 28. Moreover, while the GAL did not find the affair had an adverse impact on the children, Sharon’s deception regarding the affair prevented the GAL from conducting an adequate inquiry into the matter. Although the GAL could not provide an opinion on the matter, other testimony established the affair could have had an adverse impact on the children. Allen testified that Sharon made several trips to Texas, where Scharbano lived, while leaving the children at home. One trip lasted nine days. Allen also testified that Sharon became increasingly distracted by texts and calls, even going outside for long periods of time and hiding in the home. Accordingly, we find the chancery court was not manifestly wrong or clearly erroneous, and this issue is without merit.
II. Age Factor/Sex-and-Health Factor
¶ 29. The chancery court found the age-of-the-child factor was neutral “in that both children are now in school.” With regard to the sex-and-health-of-the-child factor, the chancery court stated: “Both children are male children[,] and therefore this factor favors the father.” Sharon argues the chancery court erred by finding the sex-and-health factor favored Allen solely on the basis of the children’s gender. She further argues the two factors should have been grouped together as one factor, instead of treating them as two separate factors.
¶ 30. To begin, it is correct that many cases group “age, sex, and health” together into one Albright factor. See, e.g., Hutchison v. Hutchison, 58 So.3d 46, 48 (¶ 7) (Miss.Ct.App.2011); Brumfield v. Brumfield, 49 So.3d 138, 144 (¶ 20) (Miss.Ct.App.2010); Woodham v. Woodham, 17 So.3d 153, 156 (¶ 9) (Miss.Ct.App.2009). However, in Albright the supreme court actually separated the two factors and stated: “The age of the child is subordinated to that rule and is but one factor to be considered. Age should carry no greater weight than other factors to be considered, such as: health, and sex of the child.... ” Albright, 437 So.2d at 1005. Additionally, there are a variety of cases that continue to divide the factors into two separate categories. See, e.g., Forthner v. Forthner, 52 So.3d 1212, 1215 (¶ 10) (Miss.Ct.App.2010); Swiderski v. Swiderski, 18 So.3d 280, 285 (¶ 16) (Miss.Ct.App.2009); C.W.L. v. R.A., 919 So.2d 267, 272 (¶ 19) (Miss.Ct.App.2005). Thus, either approach is an acceptable analysis of the Albright factors.
¶ 31. Sharon also contends that because she was the primary caretaker for the children’s health, the health factor should have been found in her favor. However, there was ample evidence that Allen was the parent who maintained the children’s mental health by having them tested and maintaining a tutoring schedule. Thus, we agree with the chancery court that this factor favors neither party.
¶ 32. Sharon’s argument that the chancellor improperly analyzed the sex factor is also without merit. The factor considers the “sex, and health of the children.” Thus, when the health aspect is neutral, the child’s gender in relation to that of the parent is clearly relevant. Furthermore, this Court has upheld a chancellor’s determination on this factor based solely on gender. See Reed v. Fair, 56 So.3d 577, 582 (¶ 22), 584 (¶ 36) (Miss.Ct.App.2010). Accordingly, we find the chan *681 cellor was not manifestly wrong or clearly erroneous in his determination that this factor as a whole favored Allen.
III. Parenting Skills and Capacity to Provide Primary Child Care
¶ 33. The chancery court found this factor favored neither party because “both [parties] have expressed the desire and willingness to provide for the minor children.” Sharon argues the chancery court failed to determine which parent has the capacity to provide primary care, thus ignoring a major component of the analysis as required by Albright. She further claims the chancery court ignored evidence presented at trial when making this determination.
¶ 34. Sharon asserts the chancellor should have found this factor in her favor because, prior to the separation, she was a stay-at-home mother; she acted as “Santa” and the “Tooth Fairy”; and she provided the primary child care. She further claims her current job as a nanny would allow her to continue to parent the children while at work. In contrast, she claims Allen’s use of multiple caregivers and his work schedule establish that, while he may have the willingness, he does not have the actual capacity to provide primary childcare.
¶ 35. There is no evidence in the record to suggest that Allen does not have the capacity to provide primary care. While both parties acknowledge that Sharon was the primary caregiver when the children were infants, Allen’s role in the child rearing has increased as the children have grown older. He is actively involved in the children’s religious training and schooling and is the primary disciplinarian. Moreover, although Allen admitted to using various caregivers, the facts establish that many of those individuals were used prior to the separation by both parties. In fact, Sharon has also used various caregivers since the separation. Finally, the parties shared joint custody of the children for nearly two years with no issues regarding Allen’s capacity to care for the children. We find the chancery court’s decision was not manifestly wrong or clearly erroneous. Thus, this issue is without merit.
IV. Home, School, and Community Record of the Children
¶ 36. The chancery court found this factor favored Allen because the children are of school age and Allen’s home is in the children’s school district. Sharon argues the chancery court failed to determine whether the children would actually have to change school districts if she were awarded primary custody or whether moving school districts would negatively impact the children. She further argues the chancery court did not consider all three factors of home, school, and community record in making its determination, but only considered the school record.
¶ 37. Although Sharon argues the chancery court failed to make a proper determination regarding the school district her children would attend if she received primary custody, she made it almost impossible for the chancery court or GAL to do so. It was not until the fourth day of trial that Sharon informed the chancery court where she would be living. When she did inform the chancery court where her new residence was located, it was determined that the home was, in fact, outside of the children’s current school district. While Sharon’s living arrangement remained uncertain, Allen remained in possession of the only house in which the children had ever resided. Furthermore, the chancery court did not address the community record of the children because the GAL reported the children were not very active *682 outside of school and church; therefore, there was no community record to consider. Accordingly, this issue is without merit.
V. Other Factors Relevant to the Parent-Child Relationship
¶ 38. The chancery court considered Charlie’s unique tutoring situation under the final factor — “other factors relevant to the parent-child relationship.” Because Charlie requires consistent tutoring and Sharon did not take him to tutoring during the summer months, the chancellor found this factor favored Allen. Sharon argues this should have been considered under a part of the factor for the child’s home, school, and community record; therefore, the chancery court improperly split that consideration into two factors, which favored Allen. She further argues there was not sufficient evidence to establish that Charlie required daily tutoring.
¶ 39. The chancellor’s analysis under this factor focused on Sharon’s refusal to adhere to the chancery court’s order requiring the parties to follow the recommendations of school personnel concerning tutoring. The chancery court noted that Sharon admitted her failure to take Charlie to tutoring during her weeks of custody in the summer. Thus, while Sharon claims that this consideration should fall under the child’s home, school, and community record, the issue is not his need for tutoring, but Sharon’s refusal to follow court orders and take Charlie to tutoring. Accordingly, we find Charlie’s unique tutoring situation was properly analyzed under “other factors relevant to the parent-child relationship.”
¶ 40. Furthermore, there was sufficient evidence to establish Charlie’s need for tutoring. Allen and Ladnier both testified regarding Charlie’s struggles. Allen also had Charlie tested by a psy-chometrist, who determined Charlie needed help. Additionally, Dr. Smith testified that Charlie was “obviously dyslexic.” Thus, the evidence clearly establishes the need for tutoring. We find this issue is without merit.
¶ 41. THE JUDGMENT OF THE FORREST COUNTY CHANCERY COURT IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ROBERTS, MAXWELL AND RUSSELL, JJ., CONCUR. CARLTON, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. FAIR, J„ NOT PARTICIPATING.

. Albright v. Albright, 437 So.2d 1003 (Miss.1983).

. Hurley and Hegwood did not testify at trial.

. It should be noted that in some current case law, the age-of-the-child and the health-and-sex-of-the-child factors are grouped together into one factor. Hutchison v. Hutchison, 58 So.3d 46, 48 (¶ 7) (Miss.Ct.App.2011). Here, the chancellor separated the factors; thus, he considered twelve factors under the Albright analysis. This will be further discussed later in the opinion.