# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-CA-01359-COA

KRIS ALEXANDER                                                        APPELLANT

v.

LEANNA SCARBROUGH                                                     APPELLEE

DATE OF JUDGMENT:            11/13/2023
TRIAL JUDGE:                 HON. AMANDA TRAWICK RAINEY
COURT FROM WHICH APPEALED:   LAUDERDALE COUNTY CHANCERY
                             COURT
ATTORNEY FOR APPELLANT:      MATTHEW ALLEN BALDRIDGE
ATTORNEYS FOR APPELLEE:      GEORGE HOWARD SPINKS
                             MATTHEW BUTLER
NATURE OF THE CASE:          CIVIL - CUSTODY
DISPOSITION:                 AFFIRMED - 09/23/2025
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., LAWRENCE AND McCARTY, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     Kris Alexander and Leanna Scarbrough[1] share a minor child (KCA)[2] but have never

been married.  The couple permanently split up in July 2022 when Leanna and KCA left the

couple's shared home in Lauderdale County.  Soon after, Kris took KCA to live with him in

Madison County—over one hundred miles away—and refused to give him back to Leanna.

Following a hearing, the chancellor entered a temporary order granting Leanna temporary

---

[1]  Leanna filed her initial complaint requesting custody as "Leanna Scarbrough,"
though elsewhere in the record her name is spelled "Leanna Scarborough."  We defer to
Leanna's spelling of her last name.

[2]  In the interest of privacy, we refer to the minor child as "KCA."

custody of the child pending a trial between the parties. After a two-day trial, the chancellor issued a final order granting full custody to Leanna and visitation rights for Kris. Aggrieved, Kris appeals. We find no error and affirm.

## FACTUAL BACKGROUND

¶2. Kris Alexander and Leanna Scarbrough commenced a romantic relationship in approximately 2013. In 2015, Kris and Leanna had a son together named "KCA." The couple and their child lived together in a shared trailer home located in Lauderdale County. The couple had a history of "break[ing] up then get[ting] back together[,]" but they separated permanently when Leanna left the home with KCA on July 10, 2022. On July 12, 2022, Kris picked up KCA from Leanna's mother's home and took him over one hundred miles away to live in Madison County with Kris. Kris refused to return KCA to Leanna.

¶3. On July 19, 2022, Leanna filed a complaint regarding filiation, custody, support, and other relief in the Lauderdale County Chancery Court concerning KCA. The complaint named Kris as the father and noted that Kris acknowledged the same. Leanna requested that Kris be adjudicated the natural father of KCA. She also sought full custody of KCA with visitation rights for Kris and child support in multiple facets from Kris. On July 20, 2022, Leanna filed a motion for temporary relief requesting that Kris "immediately return" KCA to her care.

### I. Hearing on Temporary Motion

¶4. On August 4, 2022, the chancery court conducted a hearing on Leanna's motion.

2

Leanna first called her mother, Carol, as a witness. She confirmed that KCA was the minor child of Leanna and Kris. Carol stated that the couple ended their relationship on approximately July 11, 2022, and Leanna brought KCA and herself to her mother's home. On the following day, Kris came to Carol's home "[t]o get [KCA]." She stated that Kris called Leanna to inform her he would be picking up KCA, and Leanna called her mother afterward to let her know. Kris then called Carol, asking where KCA was before cursing at her and "telling [her] that his Momma was going to whoop [her] a**" before Carol hung up on him. As soon as the phone call ended, Carol and KCA left the home.

¶5. When they came home later that day, Kris allegedly "pulled in behind [them]." Carol testified that "[h]e was drunk[,]" smelled of alcohol, and took KCA with him. She stated that she had not seen or spoken to KCA since that day. Before these events, Carol saw KCA "[e]very day." She did not contact Kris to request any visitation "[b]ecause [she] kn[e]w better" and "kn[e]w they won't let [her] talk to [KCA]."

¶6. Carol stated that she had witnessed Kris and KCA in each other's presence and had complaints about Kris's parenting skills. She explained that Kris "never spends no time with" KCA and that Leanna took care of KCA most of the time. KCA played sports, and while Kris would attend the sporting events, he "gets up at the fence and screams at" KCA. Carol testified that Leanna was a good mother. It was Carol's opinion that the couple needed to "work it out" for KCA and that there needed to be "co[-]parenting on both sides." On cross-examination, Carol admitted that the day Kris was "drunk" and took KCA, he was not

actually the one driving the car but was being driven by his "step brother[.]" She believed both Kris and Leanna were "good parent[s]." Carol did not call the police to inform them that Kris was driving drunk, because "he wasn't driving."

¶7. Next to testify was Leanna. She testified that she ended her relationship with Kris and "left the home" on approximately July 10, 2022. She and Kris "had gotten into it" at a baseball game, and the next day, Leanna "knew that he wasn't going to be in a good mood." She asked him what they were doing for the day, and Kris responded that "he didn't give a f*** what [she] did," so she told him that she and KCA were going to her mother's home. The next day, Kris called her and "was telling [her] that his mom was going to get [KCA] . . . Friday, and that she would bring him back home to [Leanna] that Sunday." Leanna testified that she communicated to Kris that he could see or call KCA at any time. Two days after she left, Kris "packed all [her] stuff up into a trash bag" and "told [her] to come get it or it was going to be in the trash the next day." On July 12, Kris got angry and went to get KCA while Leanna was not there.

¶8. Leanna testified that she had not seen her son since Kris picked him up on July 12. Kris had let her speak with KCA on the phone but "very little[.]" Kris would "grab[] the phone from [KCA]" and "hang up in [Leanna's] face" while she was speaking to her son. Leanna testified that KCA was seven years old and had never been away without her before. KCA was always in her care, custody, and control. Leanna stated that she took more time to care for KCA than Kris. She had KCA registered to attend school at "Southeast

4

Elementary" in Lauderdale County. She testified that to her knowledge, Kris was "staying with his mother in Flora" and had not taken KCA to Southeast Elementary for his first day of first grade.

¶9. Leanna testified that Kris "was just really uptight on" her and KCA, "like [they] couldn't do anything or go out to anything." Leanna stated that she was twenty-nine years old, in good physical and mental health, and did not take any medications. She was employed at Chick-fil-A and planned to keep working there until she found "something better." Leanna testified that Kris worked at Barber and Sons while they were still in a relationship, but "[h]e actually took [KCA], he quit his job, and went straight to [his] mom's." Kris also "sold the trailer" that the two lived in, which still had "some of" Leanna's belongings in it. During Leanna's testimony, an exhibit made up of text messages between her and Kris was entered into evidence. Essentially, the messages showed Kris accusing her of cheating on him and not allowing her to speak with KCA often.

¶10. On cross-examination, Leanna stated that she and Kris had lived together since KCA's conception and "ha[d] separated plenty of times." She also alleged there were "plenty of times" Kris made her and KCA get out of his home "without a job or a dollar to [her] name." Throughout KCA's life, he had been between Leanna and Kris, but Leanna contended that he was with her "most of the time[.]" Leanna rested her case following her own testimony.

¶11. Kris then called his stepbrother James McDaniel to testify. At Kris's request, McDaniel drove him to Carol's home on July 12, 2022. After following Carol home, he

5

noted that KCA had not been wearing a seat belt and that Carol was "aggravated[.]" McDaniel stated that Kris did not smell of alcohol and had not been drinking. KCA "was happy to see [Kris]."

¶12. Kris also testified. He testified that he and Leanna had "been in a relationship for eight years" and shared one son, KCA. At the time of the hearing, Kris was living with his mother and her husband and described the living situation as "great." He stated that the only times he had ever been without KCA were "when [Leanna] has left" and he was unable to see KCA. On the night of July 12, Kris "received a phone call from" a friend's wife and "[f]elt like [KCA] was abandoned and in danger." He also alleged that Leanna's mother had "a problem with prescription pills." Kris testified that he "found prescription pills in [Leanna's] purse three days prior to the baseball game" they attended. Leanna "said they were for anxiety and depression" and that "[h]er mother got them from a doctor's office."

¶13. Before going to Carol's home, Kris asked McDaniel to come with him because he "didn't feel comfortable" going alone. Kris "called the Lauderdale County Sheriff's Department . . . three times that night to try to get them to meet [him and McDaniel] over there so there wouldn't be an altercation in front of [KCA]." When they initially arrived at Carol's home, no one was there. He and McDaniel "rode down the road" and saw Carol pull into a "parking lot[.]" According to Kris, "[t]hat's when [they] noticed [KCA] was sitting in the front seat with no seat belt on." They followed Carol home, and after pulling into the driveway, Carol "hopped out" and "started cursing [him]." Kris "walked up to the vehicle[,]"

6

saw KCA "sitting in the passenger seat with his back to the door against the window with no seat belt on[,]" and extended his arms out to KCA. KCA "came to [his] arms" and they left to go back to Kris's home.

¶14. KCA stayed with Kris up to the time of the hearing. Kris was unemployed at the time of the hearing allegedly because he had been watching KCA "24/7." Kris attempted to enroll KCA in school near him but was denied all of KCA's records and a "withdrawal form to sign him up to a school." Kris had wanted KCA "to go to East Flora Elementary School in Flora, Mississippi," and take part in their "dyslexia class." He also stated that he had an interview for a new job lined up. Kris testified that his own personal health was "good[,]" both physically and mentally. He also stated that he had "very good parenting skills" and always put KCA first. He alleged that he had offered Leanna a chance to see KCA and had let KCA talk to Leanna "every day" for "[a]s long as he wants to."

¶15. On cross-examination, Kris again alleged that Carol was on drugs but recognized that KCA did visit her on an almost daily basis. He also agreed that Leanna had been responsible for KCA's doctor's appointments and seen to his daily needs because he would be at work. He also stated that both Leanna and KCA had "been on [his] tax records" and he had "taken care of both of them."

¶16. The chancellor asked Kris additional questions, having him agree that he had sold the trailer home and moved to Flora, Mississippi. Kris stated that he did so "[t]o keep [KCA] from being in danger." He alleged that he did not discover "the prescription pain pills" until

7

"[t]hree days before" July 11. Kris also agreed that Flora was more than one hundred miles away from where Leanna was living. The chancellor informed him that it was "impossible . . . to arrange a joint custody arrangement over a hundred miles distance[,]" and Kris claimed he was unaware of that. He also stated that Flora was "a better opportunity" for KCA and had "a better school system." Additionally, he stated that "Flora has a lot less crime than Lauderdale County[.]" The chancellor again asked why he decided all of these things so quickly, and Kris claimed that he had "tried to get [Leanna] to move" in order for them to "better" themselves. He testified that they "were barely paying bills" and were "barely being able to keep" their vehicles.

¶17. Finally, after Kris rested his case, Leanna was called to testify again, in rebuttal. She testified that she possessed no prescription drugs and was not taking any prescription drugs when she left Kris in July. She stated that Kris "suspects that [her] mother is on pills, but she has prescriptions for everything she takes." She stated that any kind of prescription medication she took had been prescribed to her and would have no issue agreeing to a drug test. She admitted to having pills in a ziploc bag in her purse, and she stated that her mother "gave them to [her] because [she] stayed depressed throughout the relationship with Kris." She identified the medication from that day as Lexapro and stated she never took any of them. She "gave them back to [her] mom" after Kris "had gotten upset."

## II. Temporary Order

¶18. On August 4, 2022, the chancellor issued an order finding that "[t]he uncontradicted

proof is that the child had always lived in Lauderdale County before his removal to Flora, and that he had been enrolled since kindergarten in Southeast Elementary in Lauderdale County." Additionally, KCA had stayed with Leanna "several times before this latest episode" of separation. The chancellor found Kris's assertions that Carol was abusing prescription drugs completely without evidence, at least in the limited scope of a temporary hearing. Therefore, Leanna was granted temporary exclusive care, custody, and control of KCA, and Kris was granted the "right of reasonable visitation[.]"[3] Kris was also given the responsibility to provide child support to Leanna. The order was set to expire on February 4, 2023. On August 8, 2022, Kris filed his answer to Leanna's complaint, including a counter-claim to establish paternity and requesting sole custody of KCA. Kris also requested a drug test of all parties.

¶19. On December 5, 2022, the chancery court issued an agreed order to modify the temporary order. The order raised Kris's child support obligation by $100.00 per month and extended the temporary order's governance "until a final hearing in this matter."[4] On August 22, 2023, Leanna filed a motion to cite Kris in contempt for his failure to comply with "the temporary order dated August 4, 2022[.]" She stated that Kris bothered her and "excessively

---

[3] The chancellor also attached a temporary visitation schedule for Kris.

[4] On January 25, 2023, Leanna filed a motion to extend the current temporary order. Kris filed a motion for another temporary hearing because the order "expired" on February 4, 2023. The chancellor did not enter an order ruling on either motion, and it was discussed during trial that both parties had mistakenly overlooked the extension of the order's governance until a final hearing.

texted her routinely[.]" Specifically though, Leanna alleged that Kris had "cut [KCA]'s bookbag and placed an 'Air Tag' inside the lining to track her and [KCA]." On September 8, 2023, Kris filed a motion to compel Leanna to "submit to drug testing."

### III. Bench Trial

¶20. The custody trial took place over the course of two days, September 26 and September 28, 2023. Both Leanna and Kris were given an opportunity to present their own cases, beginning with Leanna.

### A. Leanna's Case

¶21. Dr. Steven Holifield, the assistant principal of Southeast Elementary and chair of the teacher support team, testified that KCA "began having some difficulties[,]" and the school held meetings intermittently to "go over his progress." Dr. Holifield stated that "it was very, very rare" for Leanna to miss any of KCA's progress meetings. Kris did not become involved with KCA's educational needs until January 2023—the midpoint of KCA's second year in the first grade—when Kris and his mother, Jennifer Deavers, came to the school to discuss KCA's performance. This was the first time Dr. Holifield met Kris and described his demeanor at the time to be "cordial." Kris asked for "basically, all of the documentation[] that [Leanna] received" as a parent, and Dr. Holifield "was happy to give that to him." At some point, Kris had discovered that KCA's paperwork contained "an error"

10

on the school's part, documenting that KCA was diagnosed with ADHD.[5] The error was corrected "[w]hen it was brought to [the school's] attention" by Kris.

¶22.　Soon after, Kris sent an email to Dr. Holifield alleging that he had not been made aware of a progress meeting for KCA like Leanna. He stated that he called but found that the meeting had started without him. Dr. Holifield wholly denied this accusation. Dr. Holifield had an issue with "the meaning of [Kris's] email" and noticed "a lot of falsehoods[,]" including the allegations that Dr. Holifield never informed Kris of a progress meeting and that he told Kris that KCA was "at risk of demotion to Special Education[.]" Dr. Holifield responded with a point-by-point message addressing his specific concerns from Kris's email and also copied "all those who are involved in [KCA]'s education at Southeast" as recipients.

¶23.　Kris informed Dr. Holifield that he found the email to be "demeaning" and "neither productive nor professional conduct for an assistant principal." He then emailed the superintendent "basically" asking that Dr. Holifield and KCA's first-grade teacher be "fired for violating the Code of Ethics" by including "wrong information[,]" the ADHD diagnosis, in KCA's progress paperwork. Kris was unhappy with the superintendent's response and replied that he "w[ould] escalate accordingly." Dr. Holifield was very concerned with this wording and decided, in the interest of safety, that "every time from [t]here on out, if [Kris

---

　　　[5] Testimony from Leanna and Kris, as well as other witnesses, indicated that KCA was, however, later diagnosed with ADHD.

11

was] on campus, a school resource officer w[ould] always be there."

¶24.    Rebecca Skinner, KCA's first-grade teacher, provided testimony regarding his behavior in class. Skinner testified that KCA "had some issues with just paying attention and staying focused and on task[.]" Skinner described Leanna as "an involved parent" who knew "what's going on in the classroom[.]" Skinner also stated that "any time [she] sent a message or anything like that" to Leanna, she "would always hear back from her."

¶25.    On the other hand, the first time Skinner spoke with Kris was "in January. . . [o]f 2023." She described her conversations with Kris as beginning "cordial[ly] but then as it would progress," it "very often . . . felt like [she] was being put in a position of [Kris] trying to catch [her] in a dishonesty or something of that nature[.]" While Skinner could not remember the exact conversation, she testified that it was "very confrontational," and she came to the point where she stated she "would no longer speak to [Kris] without an administrator present" because he took "a bit of an aggressive approach."

¶26.    Both Dr. Holifield and Skinner also addressed Kris's more recent allegation that KCA was falling asleep in class due to Leanna "sedating" him before school. Dr. Holifield stated that it was not typically consistent for a child with ADHD to fall asleep in class, and he did understand Kris's concerns. However, he testified that falling asleep in class was "honestly a typical behavior for a first grader," and he did not believe Leanna had been sedating KCA. Skinner likewise did not believe Kris's sedation allegation. Skinner stated that she was "not sure where [the allegation] originated," but "there was an occasion or two where [KCA] fell

12

asleep" in class. Such behavior, however, was "not abnormal" for students. She also testified that falling asleep in class was not "necessarily a symptom of ADHD, but it's definitely something that's a possibility to see because they have sometimes off[-]sleeping patterns."

¶27. Leanna's mother, Carol, also testified, largely reiterating her previous testimony from the temporary order hearing and recounting the events of the day Kris picked up KCA from her home, *see supra* ¶¶4-6. Carol stated that she did give Leanna "four or five" Lexapro pills "[i]n a plastic bag" because Leanna "stayed depressed and she was crying a lot." Leanna did not take any of the medication and later returned it to Carol. Personally, Carol was prescribed a number of medications; she recalled that once, after "having teeth pulled[,]" she was given "Norcos[.]" Kris "didn't like [that] . . . and didn't want [KCA] around [her]." Carol also testified that Leanna's new fiancé was "real good with" KCA. In sum, Carol acknowledged that Leanna and Kris were both good parents but believed that KCA had a stronger emotional tie to Leanna.

¶28. Leanna's sister Breanne also provided testimony. Breanne stated that Leanna and KCA had moved into her family's home in the fall of 2022 and were still living there at the time of trial. Breanne had four children who "all play[ed] good together" with KCA. She had observed Leanna waking and readying KCA for the day, cooking meals for him, and assisting him with homework. Breanne also testified that she had never known Leanna to take any illegal substances or medications that were not prescribed to her.

¶29. Leanna's new fiancé, Josh, testified about his living situation, explaining that he rented a "single-wide trailer, three bedroom and two bath." Once Josh and Leanna were married, Leanna and KCA would move into Josh's home. KCA would have his own room, as would Josh's son (of whom he shared joint custody). He described the relationship between KCA and Josh's son as "[a]lmost like brothers[,]" stating that the two boys would "play hard" like "typical little boys." Notably, Josh testified that KCA would get to remain at Southeast Elementary after the move.

¶30. Josh also testified that he felt as though he was being watched "[p]retty much on and off throughout the entire breakup."[6] He and Leanna "felt like [they] had people watching" and "passing the house." On one occasion, a truck pulled into Josh's driveway "late one night" and "sat there for a minute and then they left." Josh saw "one picture and a short video" of Leanna's car at his home that Leanna received from Kris.

¶31. Leanna next called Kris as an adverse witness. His testimony was similar to the testimony given at the temporary order hearing, *see supra* ¶¶12-16.[7] Overall, Kris was adamant that KCA had a stronger emotional bond with him than with Leanna. Kris acknowledged that he and Leanna had attempted to reconcile before the trial but were unsuccessful in doing so. Kris admitted to quitting his job in Lauderdale County and selling

---

[6] Presumably, Josh was referring to Kris and Leanna's "entire breakup."

[7] At one point, Kris was asked to state KCA's full name, and he did not give the correct middle name. Kris later apologized for the mistake and explained that he had accidentally stated his own middle name.

14

the mobile home shortly after Leanna and KCA left. He testified that he had to come to Lauderdale County to pick up KCA "a lot" since the temporary order was entered. Kris also remarked that Leanna "doesn't meet [him] halfway" and that he believed doing so "was fair."

¶32. Kris described his living situation with his mother Jennifer Deavers and her husband as "permanent" but also stated he planned on building a house at some point. He discussed his decision to enroll KCA in jujitsu classes in Madison County on the weekends Kris had custody. On those weekends, however, Kris worked on Saturdays, so his mother was responsible for looking after KCA. This included taking him to his jujitsu classes.

¶33. Kris also stated that KCA had participated in tee-ball for "two seasons" and that he coached the team. Leanna helped with contacting the team's parents and scheduling practices, but Kris stated that they "did that together." He agreed that Leanna was responsible for taking KCA to things like doctor's appointments, dyslexia testing, and school, as well as staying in contact with KCA's school in regard to his educational progress. However, he stated that this arrangement was necessary because he was the person providing for the family. Of particular note, the following exchange took place between Leanna's attorney and Kris:

> **Q:** And every medical record said [Leanna] was the one who was there at the doctor's office with [KCA], didn't it?
>
> **A:** Correct.
>
> **Q:** She is also the one who registered him for kindergarten, didn't she?
>
> **A:** Yes, ma'am.

15

**Q:** And she registered him for first grade?

**A:** Yes, ma'am.

**Q:** And she's the one who has been with him in meetings with the teachers regarding his [educational needs], isn't she?

**A:** Yes, ma'am.

**Q:** And so, she has had continuity of care of this child, hasn't she?

**A:** Yes, ma'am.

**Q:** And then after y'all split up, she's had custody and you've only had visitation of the Court's standard visitation, isn't that true?

**A:** Yes, ma'am.

**Q:** And during that time, she has still had continuity of care, hasn't she?

**A:** Yes, ma'am.

¶34. Kris also acknowledged that KCA had been tested for and diagnosed with ADHD; however, KCA was tested "without [Kris's] consent," and Kris did not believe KCA needed ADHD medication. Kris asserted that KCA's grades "really started improving more . . . when [he] started getting more involved in [KCA's] school work." However, Kris readily admitted that he recorded his conversations with Dr. Holifield and Skinner and accused them of "changing the stories up."

¶35. Kris also made numerous accusations against Leanna, including (again) that she "cheated and was on prescription pills." He also stated that on the night he took KCA to Madison County, Leanna had "abandoned [KCA] to go stay in a hotel room that night." He

16

"was told" about Leanna getting the hotel room but did not observe it firsthand.  Also of note, Kris testified that his mother had called Child Protection Services[8] on Leanna twice, because she "observed [Leanna] giving [KCA] Dramamine[.]"  In addition, Kris provided the chancellor with photographs of scratches on KCA's body and explained that Leanna believed "he must have got [them] from school[.]"  Kris stated that he "began to be very concerned" when he "started discovering marks on [KCA's] body" and alleged that KCA was "being bullied" by Josh's son.

¶36.    As for Kris's current employment status, from July 2022 to September 2023, Kris had four different jobs but asserted that his situation was "stable."  He stated that his current employment was full-time; however, the court's records only included a paystub indicating that he was a part-time employee.  Kris agreed to bring a paystub reflecting full-time employment to the chancellor the next day the court convened as proof, but he failed to do so.

¶37.    Finally, Leanna testified.  Her testimony also closely resembled that given at the temporary order hearing, *see supra* ¶¶7-10, 17.  Leanna testified that she was responsible for taking KCA to doctor's appointments, communicating with his school, and for his overall day-to-day care.  Leanna stated that she usually fed and bathed KCA but that Kris had helped with both tasks "sometimes."  She also stated that she and Kris would argue often in front

---

[8]  The record does not contain any documents from or testimony on behalf of the Mississippi Department of Child Protection Services.

17

of KCA and repeated that each time she had left Kris in the past, she took KCA with her.

¶38. Leanna scheduled the dyslexia evaluation for KCA and noted that Kris expressed that he was opposed and did not attend. She also scheduled KCA's ADHD evaluation and intended to set another appointment to discuss possible medication for KCA. Leanna said that "[t]he only reason why [she] ha[d]n't done it yet is because of accusations being made about [her] taking [KCA's] medication." She also noted that Kris did not begin accusing her of "trying to take [KCA]'s medication" until after they had separated.

¶39. Leanna again testified that she did not take any drugs that were not prescribed to her. She admitted to consuming alcohol "every now and then." She disclosed to the chancellor that Kris had "called the school and told the school [she] was drugging [her] child with Dramamine to make him fall asleep in class."

¶40. Leanna stated that every time Kris had KCA for a weekend, there was "always something," explaining that Kris would send her photographs of various scratches on KCA, alleging that Josh's son was responsible for them. She believed they were merely marks incurred from playing at school. At the conclusion of her own testimony, Leanna rested her case.

### B. Kris's Case

¶41. Kris's first witness when presenting his case was Marie Blanks Chatham, who was his and Leanna's landlord from 2015 to the time they finally separated in 2022. She stated that on July 11, 2022, she observed "under the carport . . . several bags of items" belonging

to Leanna "that [Kris] had packed up to get it out of the trailer[.]" Chatham also provided a vague recounting of an occasion in which she "overheard" Leanna speaking with "one of the neighbor's wives [about] Adderall as well as pot smoking." Finally, Chatham testified that "over three years ago[,]" Leanna had told her "she had taken some of [KCA]'s medicine to calm her nerves."

¶42. Kris's mother, Jennifer, also testified. Jennifer confirmed that Kris was living with her and her husband in Madison County and stated that KCA had his own room. She stated that "[a]s of today," she did not have a "very high opinion" of Leanna's parenting skills. Leanna "ha[d] not proven to put [KCA]'s needs as a priority," and Jennifer had "observed so many things that [were] so disappointing with her behaviors" in the previous year. On the other hand, she described Kris as "put[ting KCA] first" and being a "great father[.]" Jennifer also alleged that KCA seemed to be "withdrawing" and spending more time alone.

¶43. Kris also subpoenaed Scott Riley, who had to be brought to the courthouse after he failed to arrive for the trial. Scott merely testified to seeing Leanna in Josh's driveway one night and taking a photograph of her. Leanna had a "silhouette of a can" in her hand and "[p]robably a tote." Scott sent a text message to Kris to let him know what he had observed.

¶44. Finally, Kris testified again on his own behalf. Essentially, he reiterated how strong his bond was with KCA and touched on a few points previously mentioned, such as his attendance at doctors' appointments and his involvement with KCA's education. Kris then rested his case.

## IV. Final Judgment and Appeal

¶45. At the close of the trial, the chancellor required that both Kris and Leanna undergo drug testing. The chancellor noted that Leanna's test results were negative, and Kris's were positive only for marijuana, for which he possessed a medical registration card. On November 13, 2023, the chancellor entered the final judgment in the case. The chancellor included a full analysis of the *Albright* factors, *see infra* ¶47, which will be discussed in greater detail in our analysis. Overall, the chancellor awarded Leanna "the exclusive care, custody and control of the minor child, KCA subject to visitation being granted to Kris." The chancellor placed particular emphasis on Kris's past interactions with professionals involved with KCA's health and education, Kris's decision to move over one hundred miles away after Leanna left him, and Leanna's consistent care-taking of KCA since he was born. The chancellor also found Kris was in civil contempt regarding his numerous texts to Leanna and the placement of an Air Tag in KCA's backpack. On December 18, 2023, Kris appealed.[9]

## STANDARD OF REVIEW

¶46. "The standard of review for a child-custody case is a narrow one." *Munday v. McLendon*, 287 So. 3d 303, 309 (¶25) (Miss. Ct. App. 2019). This Court will not reverse unless the chancellor "made findings that are manifestly wrong or clearly erroneous or applied an improper legal standard." *Id.* (citing *Smith v. Smith*, 97 So. 3d 43, 46 (¶7) (Miss.

---

[9] Kris filed seven motions while this appeal was still pending to request extensions of time.

2012)).  "[I]n child custody cases, the appellate court does not need to re-examine all of the evidence to see if it agrees with the chancellor's ruling; rather, the appellate court's duty is merely to see if the chancellor's ruling is supported by credible evidence."  *Hammers v. Hammers*, 890 So. 2d 944, 950 (¶14) (Miss. Ct. App. 2004) (citing *Lee v. Lee*, 798 So. 2d 1284, 1288 (¶14) (Miss. 2001)).  Essentially, "[t]he chancellor has the ultimate discretion to weigh the evidence the way he sees fit."  *Riley v. Heisinger*, 302 So. 3d 1243, 1255 (Miss. Ct. App. 2020) (quoting *Johnson v. Gray*, 859 So. 2d 1006, 1013-14 (¶36) (Miss. 2003)).

## DISCUSSION

¶47.  On appeal, Kris argues that the chancellor erred by finding it was in KCA's best interest to award exclusive care, custody, and control to Leanna.  "It is well established that the best interest of the child is paramount in any child-custody case."  *Latham v. Latham*, 357 So. 3d 1157, 1161 (¶8) (Miss. Ct. App. 2023) (quoting *Roberts v. Eads*, 235 So. 3d 1425, 1428 (¶12) (Miss. Ct. App. 2017)).  The chancellor must utilize the following factor-analysis test to determine a child's best interest:

> (1) the child's age, health, and sex; (2) the parent with the continuity of care prior to the separation; (3) the parent with the best parenting skills and the willingness and capacity to provide primary child care; (4) the parents' employment and the responsibilities of that employment; (5) the parents' physical and mental health and age; (6) the emotional ties of the parent and child; (7) the parents' moral fitness; (8) the child's home, school, and community record; (9) the child's preference at the age sufficient to express a preference by law; (10) the stability of the parents' home environments and employment; and (11) other factors relevant to the parent-child relationship.

*Id.*; *see Albright v. Albright*, 437 So. 2d 1003, 1005 (Miss. 1983).

21

¶48. Notably, the *Albright* analysis is not "a mathematical equation." *Id.* at (¶9). This Court will not and "**cannot** reweigh the evidence and must defer to the chancellor's factual findings so long as they are supported by substantial evidence." *Id.* (emphasis added). In other words, the *Albright* factors are all important, but "the chancellor has the ultimate discretion to weigh the evidence the way he sees fit." *Id.* Kris's argument lists specific "errors" in the chancellor's *Albright* analysis; we examine each alleged error in turn.

A.    Age, Health, and Sex

¶49. Kris first alleges that the chancellor failed to properly consider the "age, health and sex" factor. In particular, Kris contends that "all of the activities [KCA] enjoys . . . are activities that traditionally involve the father as opposed to the mother" and that the chancellor "gave absolutely no consideration to the desperate need of young boys to have a strong and constant father figure in their life." The chancellor's finding here was succinct, stating "[t]he male minor child is age 8 and very healthy. This factor favors neither parent." Kris places a great deal of emphasis on his and KCA's "special bond as a result of mutual interests born out of their shared masculinity." Kris is correct that "a chancellor **may** determine that the sex of a male child weighs in favor of granting custody to the father." *Wooten v. Wooten*, 333 So. 3d 610, 616-17 (¶18) (Miss. Ct. App. 2022) (citing *Barbaro v. Smith*, 282 So. 3d 578, 597 (¶85) (Miss. Ct. App. 2019); *Klink v. Brewster*, 986 So. 2d 1060, 1063-64 (¶13) (Miss. Ct. App. 2008)).

¶50. But a chancellor may also "find that the child's sex does or does not weigh in favor

of the parent of the same sex as the children, **depending on the specific facts of the case**."

*Id.* Crucially, we recognize that "the chancellor has the ultimate discretion to weigh the evidence the way [s]he sees fit." *Latham*, 357 So. 3d at 1161 (¶8). Here, the specific facts of the case evidence a close relationship between Leanna and KCA regardless of their respective sexes. Leanna coordinated KCA's tee-ball team when Kris was serving as the coach and showed no opposition at trial to KCA getting involved in other extracurricular activities.

¶51. Further, Kris fails to recognize that the *Albright* analysis is an analysis of **multiple** factors. Indeed, "[t]he age and sex of a child are merely **factors** to be considered under *Albright*[.]" *Latham*, 357 So. 3d at 1162 (¶14) (emphasis added) (quoting *Sobieske v. Preslar*, 755 So. 2d 410, 413 (¶10) (Miss. 2000)). Here, the chancellor did not even weigh this factor in favor of Leanna; the factor was deemed neutral. And as discussed further below, the chancellor has the "sound discretion" to decide "[w]hat weight to assign to this fact in the *Albright* analysis[.]" *Wooten*, 333 So. 3d at 616-17 (¶18) (citing *Barbaro*, 282 So. 3d at 597 (¶85)). "This is a finding of fact that cannot be disturbed on appeal absent a clear showing of an abuse of discretion[.]" *Id.* There is nothing in the record to suggest that the chancellor's decision to find this factor neutral was baseless or the result of an abuse of discretion. She simply placed more weight upon other factors, just as she was authorized to do.

B.     **Continuing Care**

¶52. Next, Kris contends that the chancellor's finding that the continuing-care factor favored Leanna was made in error. The chancellor found:

> Leanna was a stay at home mother for the first couple years of the minor child so she was the primary caretaker during that time. However, even after she began working again, she was the person that **got the child up each morning, fed him and took him to school**. She **cooked most of his meals and bought his clothing**. She was the parent that **took the child to all of his doctor appointments**. Both parents did help with homework and bathing of the child. **Leanna has always been the parent that dealt with all school issues** until Kris decided to get involved in December of 2022. After the Temporary Order, Kris finally got involved in the minor child's school, enrolled the child in a sporting event and attended doctor's appointments with the child. The Court finds this factor favors Leanna.

(Emphasis added).

¶53. Kris did not dispute the extent of Leanna's involvement in KCA's day-to-day tasks, but merely that he was involved in a different capacity as the home's "breadwinner." The chancellor found that Leanna's care was of a more consistent nature because Kris had only become more involved after the temporary order granting Leanna custody was entered. On appeal, this Court's duty "is merely to see if the chancellor's ruling is supported by credible evidence." *Hammers*, 890 So. 2d at 950 (¶14) (citing *Lee*, 798 So. 2d at 1288 (¶14)). Testimony showed that Leanna was involved in KCA's life from the time he was born to the time of the trial. She was responsible for registering KCA for school, taking KCA to doctor's appointments, and maintaining KCA's day-to-day schedule. Additionally, testimony evinced that each time Leanna had left Kris in the past, she had always taken KCA with her. This finding is supported by credible evidence in the record.

24

## C. Parenting Skills

¶54. Additionally, Kris contests the chancellor's finding that Leanna had the best parenting skills, willingness, and capacity to provide primary care.

> Both parents are good parents and they both love their child. However, **Leanna has handled the school issues as well as the doctor appointments in a more appropriate manner**. Part of parenting is being able to discuss any and all issues with school personnel as well as working with doctors to find solutions to a child's learning disabilities. Leanna continuously met with school personnel in order to help her child. She seemed to want to find a solution so that her child could excel in school. Kris was the opposite. **Kris may have thought he had his child's best interest in mind but his conduct caused school personnel to either not speak with him at all or to only speak with him while in the presence of other school personnel**. This takes away from the ultimate goal which is helping the minor child. Kris continued on with this same attitude with the minor child's medical doctors. This factor clearly favors Leanna.

(Emphasis added).

¶55. The chancellor heard Kris's explanations for his behavior and the testimony from others involved in the incidents concerning KCA's school and health. "Where there is conflicting testimony, the chancellor, as the trier of fact, is the judge of the **credibility of the witnesses and the weight of their testimony**, as well as the interpretation of evidence where it is capable of more than one reasonable interpretation." *Blakely v. Blakely*, 88 So. 3d 798, 804 (¶23) (Miss. Ct. App. 2012) (emphasis added) (quoting *Bowen v. Bowen*, 982 So. 2d 385, 395 (¶42) (Miss. 2008)). Again, we will not reverse unless the chancellor "made findings that are manifestly wrong or clearly erroneous or applied an improper legal standard." *Munday*, 287 So. 3d at 309 (¶25) (citing *Smith*, 97 So. 3d at 46 (¶7)). "Further, the [*Albright*]

25

factors are not meant to be weighed equally in every case." *Polk v. Polk*, 332 So. 3d 348, 353 (¶16) (Miss. Ct. App. 2021). As the chancellor acknowledged in her ruling (and as discussed in the following section), she found the poor relationships Kris cultivated with the school and medical professionals "very concern[ing[.]" The chancellor weighed the parents' "ultimate goal which is helping the minor child[,]"—which involves maintaining positive relationships with others who share the same goal—heavily and not without reason. We find no manifest error or improper standard that was applied here.

### D. Other Relevant Factors

¶56. Finally, Kris argues that "other factors relevant to the parent-child relationship" do not favor Leanna. The chancellor explained:

> The [c]ourt is very concerned with how Kris handles all of the minor child's issues at school and at the doctor's offices. Kris **records all conversations**, **gets very aggressive** and **interrogates everyone he talks with**. He talks to them in a **demeaning manner** and **calls them names**. This type of conduct hurts the relationship between the parents and the school. It hurts the relationship between the child and the school. It hurts the relationship between the parents and the medical professionals, which in turn prevents those medical professionals from concentrating upon the best interest of the child. The primary goal is to help the minor child and to ensure that the child will excel in school. With the **child being diagnosed with ADHD and dyslexia**, the parents need to be sure that they are getting as much professional help as needed for the child. This is the time to work closely with those professionals while the child is young. Leanna was always open and respectful to those individuals or professionals. This factor clearly favors Leanna.

(Emphasis added).

¶57. Similar to the previous argument, Kris alleges that the chancellor's decision was "focused more on the quality of Kris'[s] interactions with school and medical staff as

26

opposed to what was actually in the best interest of K[C]A[.]" But Kris fails to see that the manner in which he interacts with professionals involved in KCA's education and well-being was important to determine KCA's best interest.

¶58.    "The chancellor has the **ultimate discretion** to weigh the evidence the way [s]he sees fit." *Riley*, 302 So. 3d at 1255 (¶46) (Miss. Ct. App. 2020) (emphasis added) (quoting *Johnson*, 859 So. 2d at 1013-14 (¶36)). "We review the chancellor's application of the factors for manifest error, **giving deference to the weight that [s]he assigned each factor**." *Id.* (emphasis added) (citing *Smith v. Smith*, 206 So. 3d 502, 513 (¶24) (Miss. 2016)). After a temporary custody hearing and two days of trial testimony from numerous persons involved in KCA's life, the chancellor found Kris's behavior toward trained professionals tasked with helping KCA "very concern[ing.]"  This Court has held that weighing this final factor according to a child's "unique" educational needs, specifically dyslexia, is permitted. *See Flowers v. Flowers*, 90 So. 3d 672, 682 (Miss. Ct. App. 2012).[10]  Accordingly, the chancellor assigned this factor a fair amount of deference, and this Court will not circumvent that deference unless we find "manifest error" on the chancellor's part. *Id.*

_____

[10]   *Flowers* involved an argument that the chancellor's consideration of a child's dyslexia and resulting tutoring schedule was wrongly considered under the "other factors" *Albright* factor rather than the schooling and educational factor. *Flowers*, 90 So. 3d at 682 (¶¶38-39).  This Court held that the issue was not the minor child's need for tutoring but, rather, the mother's failure to take the child to tutoring. *Id.*  While analyzing a different issue, we find a similarity in Kris's approach to KCA's educational needs. *Id.*  In *Flowers*, this Court found the tutoring situation properly weighed against the mother. *Id.* We find the chancellor's determination that this factor weighed against Kris was supported by the evidence.

**CONCLUSION**

¶59. In an appeal from a judgment deciding child custody, this Court will only reverse a chancellor's decision if the chancellor "made findings that are manifestly wrong or clearly erroneous or applied an improper legal standard." *Munday*, 287 So. 3d at 309 (¶25) (citing *Smith*, 97 So. 3d at 46 (¶7)). Based on the record before this Court, we cannot say the chancellor reversibly erred by awarding custody of KCA to Leanna. There was substantial evidence in the record supporting the chancellor's legal determinations and fact-finding functions. Therefore, this Court affirms.

¶60. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, McCARTY, EMFINGER, WEDDLE AND LASSITER ST. PÉ, JJ., CONCUR.**